# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 17, 2018          Decided January 4, 2019

No. 17-3090

UNITED STATES OF AMERICA,
APPELLEE

v.

FRANCISCO CARBAJAL FLORES, ALSO KNOWN AS DALMATA,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cr-00143-1)

---

*Richard K. Gilbert*, appointed by the court, argued the cause and filed the briefs for appellant. *Kristen G. Hughes*, appointed by the court, entered an appearance.

*Peter S. Smith*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Jessie K. Liu*, U.S. Attorney, and *Elizabeth Trosman* and *John P. Mannarino*, Assistant U.S. Attorneys.

Before: WILKINS and KATSAS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*.  Appellant Francisco Carbajal-Flores pleaded guilty to one count of conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity ("RICO conspiracy"), in violation of 18 U.S.C. § 1962(d); one count of accessory after the fact for the murder of an officer or employee of the United States, in violation of 18 U.S.C. §§ 3, 1111, and 1114; and one count of accessory after the fact to the attempted murder of an officer or employee of the United States, in violation of 18 U.S.C. §§ 3, 1113, and 1114.  He appeals his sentence, arguing that the District Court erred when it considered his murder of a Mexican national in Mexico when calculating his sentence under the Sentencing Guidelines.  We agree with Flores, and we vacate and remand to the District Court for resentencing.

**I.**

The following facts are taken from the Stipulated Statement of Facts attached to Flores's Plea Agreement.  Flores does not dispute the facts on appeal.

Flores was a member of the Los Zetas Cartel ("the Cartel") – a violent and sophisticated criminal organization spanning from Central America to the United States.  The Cartel was responsible for transporting multi-ton quantities of cocaine and marijuana, on a monthly basis, from Mexico to the United States.  The Cartel's hit squads patrolled Cartel-controlled territory primarily by vehicle, providing protection for the Cartel's illegal activity, including protection of its lucrative drug trafficking routes from Mexico to the United States, identification and elimination of rival cartel members, kidnappings, carjackings, human smuggling, and assassinations.

In January 2011, while assigned to a hit squad located in San Luis Potosí, Mexico, Flores and others kidnapped a person

that they believed to be a rival cartel member. During the kidnapping, Mexican authorities confronted Flores's hit squad, and a chase and gun battle ensued. Flores's hit squad eventually escaped. During the escape, Flores was ordered to execute the kidnapping victim, and Flores did so by shooting him.

On February 15, 2011, ICE Special Agents Jaime Zapata ("SA Zapata") and Victor Avila ("SA Avila") were returning to Mexico City after meeting with U.S. personnel in Matehuala, Mexico. As the two ICE agents drove south on Mexican Highway 57, outside of San Luis Potosí, they encountered two vehicles, each occupied by an armed Cartel hit squad. The two hit squads forced the ICE agents off the road and attempted to steal their armored car. The hit men subsequently fired nearly 100 rounds at the Special Agents, with several rounds entering the armored car through an open window. SA Zapata was killed and SA Avila was seriously wounded. The hit squads fled.

Flores was not present during the February 15, 2011, attack on the ICE agents. The next day, Flores attempted to rejoin his hit squad but was told not to return. Members of the hit squad told Flores what had happened during the attack, and they made several inculpatory statements about their participation in that attack.

Law enforcement personnel from Mexico and the United States worked together to identify the perpetrators. On February 23, 2011, Mexican authorities arrested members of the hit squad, including Flores, who was serving as the hit squad's lookout at the time of the arrest. Authorities recovered various firearms the hit squad had stored, and ballistics testing linked those weapons to the attack on the ICE agents.

On May 28, 2011, Flores voluntarily surrendered to the U.S. government. In connection with the February 15, 2011, attack on the two ICE agents, Flores was charged by Information with RICO conspiracy (Count One); accessory after the fact for the murder of an officer or employee of the United States (Count Two); and accessory after the fact to the attempted murder of an officer or employee of the United States (Count Three).

In January 2012, Flores pleaded guilty to all charges in the Information. Pursuant to the Plea Agreement, the parties agreed to a Sentencing Guidelines calculation, which Flores now argues was legally incorrect. To calculate a Guidelines sentence, a district court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. *See* U.S.S.G. §§ 1B1.1(a)(1)-(2), 1B1.2(a). Here, under Count One, the parties agreed that

> [t]he underlying racketeering activity conducted by members of the criminal enterprise in this case involved murder; distribution or importation of a controlled substance; conspiracy to do the same; and accessory after the fact to commit the murder or the attempted murder of an officer or employee of the United States.

J.A. 39. The parties agreed to U.S.S.G. § 2E1.1 as the applicable offense guideline, and they agreed that the base offense level for Count One would be 43 under U.S.S.G. § 2E1.1(a)(2), because the base offense level for murder is 43 under U.S.S.G. § 2A1.1(a).

The Plea Agreement calculated the base offense level for Count Two as 30 under U.S.S.G. §§ 2A1.1 and 2X3.1(a)(3)(A), and it calculated the base offense level for Count Three as 27

under U.S.S.G. §§ 2A2.1 and 2X3.1. Under U.S.S.G. § 3D1.2(c), the parties agreed to treat the counts as closely related because Count One embodied the conduct alleged in Counts Two and Three. Therefore, the applicable offense level to the group became that of the most serious of the counts within the group, resulting in an overall offense level of 43.

Pursuant to the Plea Agreement, if Flores demonstrated an acceptance of responsibility to the satisfaction of the government, the government would agree to a two-level reduction with respect to Count Two under U.S.S.G. § 3E1.1(a) and a one-level reduction under U.S.S.G. § 3E1.1(b). With a Criminal History Category of I and a base offense level of 40, the parties agreed that the applicable Guidelines range would be 292 to 365 months of incarceration. The parties also agreed that the District Court would make any final Guidelines determinations and that the agreed-upon calculation in the Plea Agreement was not binding on the Court.

The presentence report ("PSR") arrived at the same Guidelines calculation as the Plea Agreement but calculated it differently by grouping the counts pursuant to U.S.S.G. § 3D1.2(b) and determining the combined offense level pursuant to U.S.S.G. § 3D1.4. The PSR identified four separate overt acts of the RICO conspiracy described in Count One: the murder of SA Zapata (Overt Act One); the attempted murder of SA Avila (Overt Act Two); the murder of the kidnap victim in January 2011 (Overt Act Three); and distribution/importation of five kilograms or more of a mixture and substance containing a detectable amount of cocaine and 1,000 kg or more of a mixture and substance containing a detectable amount of marijuana (Overt Act Four).

Flores objected to the PSR's analysis with respect to Overt Act Three on the ground that the murder of the Mexican kidnap

victim was not "racketeering activity" because it was not a violation of U.S. law. The government also filed some objections and comments to the PSR, but it did not object to the PSR treating the murder of the kidnap victim as a separate racketeering activity. The government did, however, urge the PSR writer to treat the murder of SA Zapata as reasonably foreseeable conduct.

The Probation Office did not change its calculation with respect to the murder of the kidnap victim. It responded that

> [Flores] would be held accountable for any activities that were reasonably foreseeable in connection with the criminal activity that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, USSG § 1B1.3(a)(1)(B). The murder of the kidnap victim in January of 2011, was also in furtherance of the Zeta's lucrative drug trafficking operation and was included in the RICO offense to which he pled. However, should the Court determine the defendant's position is correct the total offense level would be 27 (base offense level 30, reduced by three levels for acceptance of responsibility) and his advisory guideline range would be 70 to 87 months.

J.A. 118.

Before sentencing, both parties filed sentencing memoranda. The government urged the District Court to adopt the analysis of the PSR and moved for a downward departure

of seven levels in light of Flores's substantial assistance to the government. This seven-level departure was based, in part, on Flores's testimony against his coconspirators, and it resulted in a guideline range of 135 to 168 months. Flores's sentencing memorandum repeated his argument that the murder of the Mexican kidnap victim could not be racketeering activity under 18 U.S.C. § 1961.

At the sentencing hearing, Flores's counsel repeated his argument about the Mexican kidnap victim and the government repeated its argument that the murder of SA Zapata and "the other murders were all certainly foreseeable." J.A. 158-61. The District Court did not specifically address Flores's argument and adopted the PSR as written. The District Court sentenced Flores to a total of twelve years of incarceration, to be followed by three years of supervised release. The District Court entered judgment in November 2017. Flores timely filed a notice of appeal.

## II.

In reviewing the reasonableness of a sentence, we proceed in two steps. *United States v. Warren*, 700 F.3d 528, 531 (D.C. Cir. 2012). First, we look to whether the District Court committed significant procedural error in determining the Guidelines range. *Id.* Procedural errors include "failing to calculate (or improperly calculating) the Guidelines range . . . or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). We review purely legal questions *de novo*, review factual findings for clear error, and give due deference to the District Court's application of the Guidelines to the facts. *United States v. Jones*, 744 F.3d 1362, 1366 (D.C. Cir. 2014). Second, we consider holistically whether the sentence was objectively reasonable given the sentencing factors outlined in 18 U.S.C. § 3553(a). *Warren*,

700 F.3d at 531. If a procedural objection was timely made before the District Court, we review it for abuse of discretion. *In re Sealed Case*, 809 F.3d 672, 675 (D.C. Cir. 2016). If not, we review the claim for plain error. *Id.*

## A.

The government relies on several civil cases to argue that because Flores expressly adopted the Guidelines calculation in his Plea Agreement, he is judicially estopped from challenging that calculation on appeal. Importantly, however, the government conceded at oral argument that no court has ever held that a defendant is estopped on appeal from making an argument of law with respect to his or her plea agreement. *See* Oral Arg. Recording 48:32-49:05. We find no reason to break new ground by adopting the government's judicial estoppel argument here.

Even setting aside the questionable applicability of the judicial estoppel doctrine to plea agreements, the government's judicial estoppel argument fails on the merits. "[J]udicial estoppel is used to preclude a party from taking a position that is inconsistent with one successfully asserted by the same party in a prior proceeding." *United Mine Workers of Am. 1974 Pension v. Pittston Co.*, 984 F.2d 469, 477 (D.C. Cir. 1993). While "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle," *New Hampshire v. Maine,* 532 U.S. 742, 750 (2001) (internal quotation marks, alterations, and citation omitted), the Supreme Court has specified at least three questions that should inform a court's decision to apply judicial estoppel:

> (1) Is a party's later position clearly inconsistent with its earlier position? (2) Has the party succeeded

> in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled?  (3) Will the party seeking to assert an inconsistent position derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped?

*Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010) (citing *Maine,* 532 U.S. at 750-51).

Here, Flores initially agreed to a Guidelines calculation of 40 in his Plea Agreement but later challenged this calculation in his objections to the PSR, again in his sentencing memorandum, and again at the sentencing hearing.  He does not dispute that he committed the murder of the kidnap victim as detailed in the Information and the Stipulated Statement of Facts; instead, he objects to the District Court's use of the kidnap victim's murder in arriving at his Guidelines calculation, which is a legal question.  Stipulations about legal issues in plea agreements are not binding on the district court.  "While parties may enter into stipulations of fact that are binding upon them unless they can show manifest injustice, parties may not stipulate to the legal conclusions to be reached by the court."  *Weston v. Wash. Metro. Area Transit Auth.*, 78 F.3d 682, 685 (D.C. Cir. 1996) (internal quotation marks and citations omitted).

Furthermore, the Plea Agreement specified that "the failure of the Court or the Probation Office to determine the guideline range in accordance with the above calculations will not void this Plea Agreement," and "the sentence to be imposed is a matter solely within the discretion of the Court."  J.A. 40.  In light of these express statements, the government fails to

establish how Flores succeeded in persuading the District Court to accept the Plea Agreement's Guidelines calculation. What Flores received when he entered into the Plea Agreement was a reservation by the District Court to determine the appropriate sentence at sentencing – not a favorable judicial decision. We refuse to accept the government's argument that a defendant prevails in obtaining a favorable judicial decision when a district court accepts a plea agreement subject to determining his or her sentence at sentencing. Accordingly, judicial estoppel does not apply.

**B.**

Flores argues that the PSR and the District Court were incorrect in considering his murder of the Mexican kidnap victim as a "racketeering activity" in calculating his sentence. The government argues that in calculating Flores's offense level, the District Court properly included Flores's 2011 murder of the kidnap victim as "relevant conduct" under U.S.S.G. § 1B1.3, and that by its plain language, the relevant conduct provision includes extraterritorial conduct. Flores argues that the government raises its relevant conduct argument for the first time on appeal.

Before diving into the merits of Flores's argument, we must address whether the District Court properly calculated Flores's base offense level. The District Court did not explain the basis of Flores's sentence. Rather, after listening to the parties' arguments on the role the murder of the kidnap victim should play at sentencing, the district court stated that it would "adopt the [presentence] report as written." J.A. 161. The Plea

11

Agreement[1] and PSR do not mention "relevant conduct" under U.S.S.G. § 1B1.3. The only mention of "relevant conduct" appears in the PSR's Addendum, in response to Flores's objection to the use of the kidnap victim murder in the calculation of his base offense level. In response to Flores's objection, the Probation Office stated that "[a]s part of the jointly undertaken criminal activity in furtherance of the racketeering conspiracy, the murder of SA Zapata by the coconspirators is relevant conduct and an act in furtherance of the RICO conspiracy" for which Flores "would be held accountable . . . [under] USSG § 1B1.3(a)(1)(B)." J.A. 118. After discussing why the murder of SA Zapata is "relevant conduct" under § 1B1.3(a)(1)(B), the Probation Office stated – without citation – that "[t]he murder of the kidnap victim in January of 2011, was also in furtherance of the Zeta's lucrative drug trafficking operation and was included in the RICO offense to which [defendant] pled." J.A. 118.

The problem with the Probation Office's response is that in discussing relevant conduct, it relied on § 1B1.3(a)(1)(B) – the subsection that concerns "act and omissions of *others*" in a jointly undertaken criminal activity, also known as the accomplice attribution element of relevant conduct. U.S.S.G. § 1B1.3(a)(1)(B) (emphasis added). The subsection that would address Flores's murder of the kidnap victim is § 1B1.3(a)(1)(A),[2] which concerns the "acts and omissions

_____

[1] The Plea Agreement makes only one reference to U.S.S.G. § 1B1.3. Specifically, it cites to § 1B1.3 and § 2A1.1 for the proposition that the base offense level for Count One is 43.

[2] U.S.S.G. § 1B1.3(a)(1)(A) states:

> Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and

committed . . . by the *defendant*." *Id.* § 1B1.3(a)(1)(A) (emphasis added).

The record and the government's briefing lack a single citation to § 1B1.3(a)(1)(A). Similarly, the PSR and its Addendum never assert that the murder of the Mexican kidnap victim was included as "relevant conduct." Indeed, in the PSR's Addendum, the Probation Office conceded that "should the Court determine the defendant's position is correct" with respect to the murder of the Mexican kidnap victim, "the total offense level would be 27 . . . and his advisory guideline range would be 70 to 87 months" rather than 292 to 365 months. J.A. 118. By virtue of adopting the PSR as written, the District Court appears to have conflated the relevant conduct subsections and calculated Flores's base offense level of 43 based on § 1B1.3(a)(1)(B). The government did not defend this basis at oral argument and instead contended that we should affirm based on the understanding that the District Court relied on § 1B1.3(a)(1)(A). *See* Oral Arg. Recording 28:43-29:12. However, time and again, the Supreme Court has stated that "[a] district court that 'improperly calculat[es]' a defendant's Guidelines range . . . has committed a 'significant procedural error.'" *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). We cannot say as a matter of law that the District Court relied on § 1B1.3(a)(1)(A) in calculating Flores's base offense level or that it would have relied on this provision if it had the opportunity to do so. We therefore cannot affirm in light of such uncertainty.

---

(iv) adjustments in Chapter Three, shall be determined on the basis of . . . all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant.

13

**C.**

Even if the District Court had intended to consider Flores's murder of the Mexican kidnap victim as relevant conduct under U.S.S.G. § 1B1.3(a)(1)(A), it would not have been able to do so. The PSR based its Guidelines calculation on the assumption that the kidnap victim murder was "underlying racketeering activity" under U.S.S.G. § 2E1.1. However, at oral argument, the government conceded that the murder of the Mexican kidnap victim in Mexico was not "racketeering activity." *See* Oral Arg. Recording 23:16-23:20. We agree with the government's concession and must reverse the District Court because the relevant conduct Guidelines cannot be used to calculate the base offense level of an act that does not qualify as "racketeering activity." To explain our holding – and because "[t]he Guidelines are complex," *Molina-Martinez*, 136 S. Ct. at 1342 – we explain the sequence of steps a district court must follow in calculating a defendant's sentence under the Guidelines.

To arrive at a Guidelines sentence, a district court must first determine the offense guideline section from Chapter Two applicable to the offense of conviction, and it must do so by referring to the Statutory Index. U.S.S.G. §§ 1B1.1(a)(1), 1B1.2(a). At the second step, the district court must "[d]etermine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions contained in the particular guideline in Chapter Two in the order listed." *Id.* § 1B1.1(a)(2).

Here, the applicable Guidelines section for Flores's offense of conviction – 18 U.S.C. § 1962(d) – is U.S.S.G. § 2E1.1 (Unlawful Conduct Relating to Racketeer Influenced and Corrupt Organizations). U.S.S.G. § 2E1.1 instructs the

District Court to determine the defendant's base offense level by applying the greater of 19 or "the offense level applicable to the underlying racketeering activity." U.S.S.G. § 2E1.1(a). This reference to "the offense level applicable to the underlying racketeering activity" in § 2E1.1(a)(2) is a cross-reference that triggers § 1B1.3, which in turn directs the district court to consider relevant conduct in determining a defendant's base offense level. *See United States v. Carrozza*, 4 F.3d 70, 75 (1st Cir. 1993); *United States v. Masters*, 978 F.2d 281, 284 (7th Cir. 1992); *see also* U.S.S.G. § 1B1.5, application note 1 ("References to other offense guidelines . . . may be to a specific guideline, or may be more general (e.g., to the guideline for the 'underlying offense').").

While "[c]onduct that is not formally charged or is not an element of the offense of conviction may enter into the determination of the applicable guideline sentencing range," U.S.S.G. § 1B1.3, Background; in RICO cases, the relevant conduct that can be considered must also qualify as "racketeering activity," *id.* § 2E1.1(a)(2). Contrary to the government's argument that a district court can consider acts that do not qualify as "racketeering activity" so long as such activity is within the scope of the RICO conspiracy, § 2E1.1 lacks a textual hook to go beyond "racketeering activity."

The government fails to cite a single case supporting its proposition, and its argument contradicts the plain text of the RICO statute and the RICO Guidelines provision, both of which use the term of art "racketeering activity." *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 183 (1997) ("The phrase 'racketeering activity' is a term of art defined in terms of activity that violates other laws."). As the Supreme Court recently explained:

> The [RICO] statute defines "racketeering activity" to encompass dozens of state and federal offenses, known in RICO parlance as predicates. These predicates include any act "indictable" under specified federal statutes, §§ 1961(1)(B)-(C), (E)-(G), as well as certain crimes "chargeable" under state law, § 1961(1)(A), and any offense involving bankruptcy or securities fraud or drug-related activity that is "punishable" under federal law, § 1961(1)(D).

*RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2097 (2016). Importantly, to qualify as "racketeering activity," an act must be "indictable," "chargeable," or "punishable" under one of the statutes identified in § 1961(1). *Id.* at 2102. Here, the government conceded that Flores's murder of a Mexican national in Mexico was not "racketeering activity," and we agree because it would not be indictable under any of the statutes listed in § 1961(1). Accordingly, even if the District Court concluded that the Mexican kidnap murder constituted relevant conduct under § 1B1.3, it could not use that murder to calculate Flores's base offense level because § 2E1.1(a)(2) circumscribes relevant conduct to "underlying racketeering activity."

The prevailing case law supports our view. In *United States v. Carrozza*, 4 F.3d 70 (1st Cir. 1993), defendant Raymond J. Patriarca pleaded guilty to one count of conspiring to violate RICO, one count of violating RICO, four counts of interstate travel in aid of racketeering, and one count of conspiring to violate the Travel Act. *Id.* at 72. The government sought to include specific acts of relevant conduct under U.S.S.G. § 1B1.3 in determining Patriarca's base offense level, but the district court limited relevant conduct to only those predicate acts that were charged against the defendant. *Id.* at

73-74. The government appealed, and the First Circuit concluded that the district court erred when it limited relevant conduct to conduct in furtherance of the predicate acts charged against the defendant. The First Circuit held that "the term 'underlying racketeering activity' in § 2E1.1(a)(2) means simply any act, whether or not charged against defendant personally, that qualifies as a RICO predicate act under 18 U.S.C. § 1961(1) and is otherwise relevant conduct under § 1B1.3." *Id.* at 77.

Contrary to the government's current position, the government in *Carrozza* argued before the First Circuit that

> [a]n uncharged act might have been committed in furtherance of the RICO conspiracy, but if that act does not constitute "underlying racketeering activity," then there is no mechanism in § 2E1.1 for quantifying that act, because the base offense level for § 2E1.1 is equal to "the offense level applicable to the underlying racketeering activity."

Brief of Appellant United States of America at 18, *United States v. Carrozza*, 4 F.3d 70 (1st Cir. 1993) (No. 92-2213), 1992 WL 12574203. And in its brief in opposition to certiorari in the same case, the Solicitor General conceded that "underlying racketeering activity" must be interpreted to mean charged or uncharged conduct that would qualify as a predicate act under 18 U.S.C. § 1961(1). Brief for the United States in Opposition, *Patriarca v. United States*, 511 U.S. 1069 (1994) (No. 93-1350), 1994 WL 16100403 at *9.

Similarly, in cases involving the relevant-conduct analysis in the § 2E1.1 context, several other of our sister circuits have considered as relevant conduct only acts that also qualified as underlying RICO predicate acts. *See, e.g.*, *United States v.*

17

*Barragan*, 871 F.3d 689, 715-16 (9th Cir. 2017); *United States v. Massino*, 546 F.3d 123, 135 (2d Cir. 2008); *United States v. Corrado*, 304 F.3d 593, 608 (6th Cir. 2002). We are not aware of any contrary holdings in the courts of appeal. We therefore decline the government's invitation to use § 1B1.3 to extend the § 2E1.1 analysis beyond racketeering activity.

**\* \* \***

For these reasons, we conclude that the District Court erred in calculating Flores's applicable Guidelines range and that this error sufficiently prejudices Flores to require resentencing. *See United States v. Tann*, 532 F.3d 868, 875-76 (D.C. Cir. 2008).

*So ordered.*