# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 23, 2020             Decided January 8, 2021

No. 19-3023

UNITED STATES OF AMERICA,
APPELLEE

v.

DEANGELO TYRONE JENKINS,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cr-00223-1)

*Tony Axam Jr.*, Assistant Federal Public Defender, argued the cause for appellant. With him on the briefs was *A. J. Kramer*, Federal Public Defender.

*Eric Hansford*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Elizabeth Trosman* and *Elizabeth H. Danello*, Assistant U.S. Attorneys.

Before: HENDERSON and ROGERS, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

2

ROGERS, *Circuit Judge*: In the course of investigating a shooting, the police identified two automobiles that drove over three miles in tandem to the area, arrived shortly before shots were fired, and left immediately afterwards, driving rapidly back the same way they came. Appellant was later identified as the usual driver of one of the vehicles. Based on evidence collected during searches of his vehicle and person, appellant was charged with two counts of possession of a firearm by a felon, 18 U.S.C. § 922(g), and one count of simple possession of a controlled substance, 21 U.S.C. § 844(a). He conditionally pleaded guilty to the firearms charges, preserving his ability to appeal the denial of his motion to suppress evidence. Appellant contends that the police acted on evidence showing merely that his vehicle was near the shooting and associated with another car, which was insufficient to establish probable cause to seize and search his vehicle. Further, appellant contends that any probable cause to search his vehicle had dissipated by the time the police seized it 52 days after the shooting. Settled Fourth Amendment principles defeat appellant's challenges. Separately, appellant fails to show plain error occurred at his sentencing. Accordingly, we affirm the judgment.

**I.**

The following facts are uncontested. On September 2, 2017, at approximately 6:56 p.m., ShotSpotter — a system that alerts the Metropolitan Police Department ("MPD") to the location of potential gunfire — indicated that twelve rounds had been fired at 1502 Tubman Road, S.E. Upon arrival, officers discovered three victims: one who was pronounced dead on the scene, and two others who neither saw the shooter nor identified a motive for the shooting. During the investigation, detectives interviewed the driver and passenger in another car that was near the scene of the shooting. The driver had observed a black Chrysler Crossfire by the mouth of

an alley that was approximately 100 feet from where the shooting occurred. After passing the Crossfire and driving one more block, the witnesses heard gunshots. They drove out of the neighborhood to an intersection with Suitland Parkway, where the driver saw the Crossfire again, this time in the rearview mirror. The witnesses turned out onto Suitland Parkway, where they observed the Crossfire driving at a high rate of speed, followed closely by a white Infiniti SUV. The driver and passenger gave consistent accounts of these events to detectives, and the driver opined that the Crossfire and Infiniti were travelling together. The two vehicles turned off Suitland Parkway onto Firth Sterling Avenue, S.E., at which point the witnesses lost sight of them.

Using a license plate reader at the intersection of Suitland and Firth Sterling, and security cameras near the scene of the shooting, MPD Detective Thomas Roy developed additional information concerning the movements of the Crossfire and the Infiniti around the time of the shooting. Evidence showed that the two vehicles travelled together to the area of the shooting, arrived just before it occurred, left just afterwards, and remained together while fleeing the scene. Tag numbers recorded by the license plate reader identified the registered owner of the Crossfire as Lajuan Johns and the registered owner of the Infiniti as Tyrhonda Webster. Webster's current address was on Columbia Road N.W., and Lajuan Johns had a previous address on the same block. Detective Roy looked for the Infiniti on that block, without success; but in the same area he saw a man, Stephon Johns, in control of the Crossfire.

On October 10, 2017, Stephon Johns was the subject of a traffic stop in Texas. He was arrested pursuant to a District of Columbia arrest warrant for unlawful possession of a firearm and for a parole violation. The next day, Detective Roy located the Crossfire in the Providence Hospital parking lot and saw

three bullet strikes on its rear. Five days later, detectives interviewed Webster, who confirmed that she owned the Infiniti but stated that appellant, her brother, was the exclusive driver of the vehicle. An MPD database indicated appellant had been driving the Infiniti on October 11, 2017, when it was involved in a traffic accident.

On October 24, 2017, detectives saw the Infiniti parked at the corner of 14th and Harvard Streets, N.W. The police seized the Infiniti, which was taken to the D.C. Department of Forensic Sciences while Detective Roy applied for a search warrant. Upon execution of the search warrant on October 25, Detective Roy found in the Infiniti a loaded .45 caliber Taurus handgun, appellant's driver's license, and a notice of infraction that he had received in Montgomery County on September 21, 2017. Appellant was arrested pursuant to a separate warrant on November 9, 2017, and the police recovered a loaded .357 caliber Ruger revolver from his waistband and a rock-like substance from his pants pocket that field-tested positive for cocaine.

Appellant was indicted on two counts of possession of a firearm by a person convicted of a felony, under 18 U.S.C. § 922(g), and one count of simple possession of a controlled substance, under 21 U.S.C. § 844(a). He moved to suppress the guns and drugs, arguing that they were fruits of an unlawful seizure of the Infiniti without probable cause. The district court denied the motion, concluding that there was probable cause to believe the Infiniti contained evidence of a crime and was itself an instrumentality of a crime. Having decided that the search of the Infiniti was lawful, the district court rejected appellant's argument that the evidence recovered during the search incident to his arrest was fruit of a poisonous tree. Alternatively, the district court ruled that the evidence from both searches would be admissible under the good-faith

exception to the exclusionary rule. Following appellant's conditional plea to the indictment, the district court sentenced him to 47 months' imprisonment. He appeals.

## II.

It is long established that "there is a diminished expectation of privacy in automobiles, which often permits officers to dispense with obtaining a warrant before conducting a lawful search." *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018) (citing *California v. Acevedo*, 500 U.S. 565, 579 (1991)). This "so-called 'automobile exception' to the warrant requirement," *Acevedo*, 500 U.S. at 566, rests on two principal justifications: (1) the readiness with which vehicles can be moved out of the investigating jurisdiction and (2) the "pervasive and continuing governmental regulation" of vehicles. *Collins v. Virginia*, 138 S. Ct. 1663, 1669–70 (2018) (quoting *Dakota v. Opperman*, 428 U.S. 364, 368 (1976)). So "officers may search an automobile without having obtained a warrant so long as they have probable cause to do so." *Id.* at 1670 (citing *California v. Carney*, 471 U.S. 386, 392–93 (1985)). Officers have the option of either "carrying out an immediate search without a warrant" or "seizing and holding a car before presenting the probable cause issue to a magistrate." *Chambers v. Maroney*, 399 U.S. 42, 52 (1970). "A police officer has probable cause to conduct a search when 'the facts available to him would "warrant a person of reasonable caution in the belief"' that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2013) (alterations omitted) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion)). This test requires only "the kind of 'fair probability' on which 'reasonable and prudent people, not legal technicians, act.'" *Id.* (alteration omitted) (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 238 (1983)).

Appellant frames his Fourth Amendment challenge in terms of whether the Crossfire could be linked to the shooting, whether the Infiniti could be linked to the Crossfire, and whether any probable cause had gone stale by the time the Infiniti was seized on October 24, 2017, which was 52 days after the shooting. The single question that the court must decide is whether the police had probable cause to seize the Infiniti on October 24.

**A.**

Evidence collected from eyewitnesses, the Firth Sterling license plate reader, and security cameras established that the two vehicles drove together from miles away to within a few blocks of the shooting, arriving minutes before the shooting occurred; that the Crossfire was at the mouth of an alley approximately 100 feet from the shooting just before it occurred; and that after the shooting the two vehicles drove away together at a high rate of speed, returning along Suitland Parkway to the same area that they had come from. That particularly timed behavior is sufficient to establish a fair probability that the vehicles contained evidence about the shooting. Probable cause was bolstered by the Texas arrest of Johns, which supported an inference that he "could have been trying to escape the consequences of the homicide (whether police scrutiny or reprisals from rival groups)." Appellee's Br. 19. Likewise, the bullet strikes on the Crossfire indicated that the vehicle had been near gunfire, potentially on the night of the shooting under investigation. *Id.* at 19–20. Although the arrest and bullet strikes alone would not have established probable cause to search the Infiniti, they add to the totality of circumstances that must be considered. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018).

Appellant's arguments to the contrary are not persuasive. Relying on *Illinois v. Wardlow*, 528 U.S. 119 (2000), appellant maintains that there was no probable cause to believe that the Crossfire was involved in the shooting because "mere presence at a scene of a crime cannot establish probable cause to believe that the person committed the crime in question or possesses evidence of the crime" and flight from gunfire is a natural human response. Appellant's Br. 20–21. Even accepting both premises, they do nothing to address the suspicious fact that the Crossfire and Infiniti arrived in the area just two minutes before the shooting. *Wardlow* itself is no help to appellant; there the Court found reasonable suspicion for an investigative stop when the defendant was present in an area known for narcotics trafficking and, upon seeing police officers, immediately turned and fled. 528 U.S. at 124–25. "Headlong flight," the Court explained, "is the consummate act of evasion." *Id.* at 124.

Appellant maintains that even if the Crossfire can fairly be linked to the shooting, the Infiniti cannot be based on its "mere association" with the Crossfire. He relies on *United States v. Di Re*, 332 U.S. 581 (1948), where an informant, Reed, had told investigators that he was to purchase counterfeit gasoline ration coupons from a man named Buttitta. *Id.* at 583. When officers went to intercept the transaction, they found Reed in the back seat of a vehicle, holding two ration coupons. *Id.* Reed said he had received the coupons from Buttitta, who was in the driver's seat. *Id.* Di Re was in the front passenger's seat. *Id.* All three men were arrested, and during processing Di Re was found to be in possession of additional ration coupons, which proved to be counterfeit. *Id.* The Court held, on these "peculiar facts," that officers lacked probable cause to arrest Di Re, because

> The argument that one who 'accompanies a criminal to a crime rendezvous' cannot be assumed to be a

bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passersby, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal. If Di Re had witnessed the passing of papers from hand to hand, it would not follow that he knew they were ration coupons, and if he saw that they were ration coupons, it would not follow that he would know them to be counterfeit. . . . . Presumptions of guilt are not lightly to be indulged from mere meetings.

Moreover, whatever suspicion might result from Di Re's mere presence seems diminished, if not destroyed, when Reed, present as the informer, pointed out Buttitta, and Buttitta only, as a guilty party. . . . . Any inference that everyone on the scene of a crime is a party to it must disappear if the Government informer singles out the guilty person.

*Id.* at 593–94. *Di Re* is easily distinguished. Here, the vehicles' in-tandem driving to and from the scene of a shooting is suggestive of a conspiracy to perpetrate the shooting, in a way that mere presence as a passenger during what might have been an outwardly lawful transaction is not.

*Ybarra v. Illinois*, 444 U.S. 85 (1979), is similarly distinguishable. There an informant had told police that a bartender at the Aurora Tap Tavern was regularly in possession of tin-foil packets of the type used to distribute heroin. *Id.* at 87–88. Based on this information, police obtained a warrant to search the tavern and the bartender. *Id.* at 88. When officers arrived at the tavern, they frisked all the patrons, ostensibly for

weapons. *Id.* During the frisk of Ybarra, the officer felt a cigarette pack with objects in it and, after removing the pack from Ybarra's pocket, found heroin therein. *Id.* at 88–89. There was no probable cause to search Ybarra, the Supreme Court held, because the police "knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale." *Id.* at 91. While "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person," *id.*, the evidence in the instant case did not merely show that the Infiniti was in proximity to the Crossfire, but rather suggested that the two vehicles were acting in concert.

Cases cited by the government are also distinguishable in various ways, but on the whole accord with the common-sense view that there would have been probable cause to search the Infiniti had it been intercepted on the night of the shooting. For instance, in *Chambers*, 399 U.S. at 44–47, there was probable cause to search a blue station wagon containing four men based on an eyewitness account that such a vehicle had fled the scene of a robbery, where descriptions of two occupants' clothing also matched the witnesses' description. Our precedent in *United States v. Robinson*, 533 F.2d 578, 583 & n.10 (D.C. Cir. 1975), is to the same effect; there was probable cause to search a vehicle seen leaving the area in which a robbery occurred, where an eyewitness identified the car as the getaway vehicle. Our sister circuits have likewise found probable cause to search vehicles whose movements suggested that they were engaged in coordinated criminal activity. *See United States v. Howard*, 883 F.3d 703, 708 (7th Cir. 2018) (probable cause to arrest occupants of vehicle that suspiciously lingered in front of store that was robbed, drove to the store's rear door just as the robbery began, and sped away as the robber fled); *United States*

*v. Slone*, 636 F.3d 845, 849–51 (7th Cir. 2011) (probable cause to arrest truck occupant who had followed closely behind an SUV that was known to contain 500 kg. of marijuana); *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1228 (10th Cir. 2008) ("Sufficient evidence that two vehicles are driving in tandem plus evidence that one vehicle contains contraband can provide probable cause sufficient to support arresting the driver of the other vehicle.").

**B.**

Appellant contends that any probable cause to search the Infiniti became stale during the 52 days between the September 2 shooting and the October 24 seizure of the car. This court has emphasized that "the facts supporting a warrant must be 'so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time.'" *United States v. Webb*, 255 F.3d 890, 904 (D.C. Cir. 2001) (quoting *Sgro v. United States,* 287 U.S. 206, 210 (1932)). "[A]lthough the time between the application for a warrant and the discovery of the evidence supporting that application is 'not controlling,' it is nonetheless important." *Id.* (quoting *Schoeneman v. United States*, 317 F.2d 173, 177 (D.C. Cir. 1963)). For example, there was no probable cause to search a home where the application for a warrant was made 107 days after an informant had observed contraband in that location. *Schoeneman*, 317 F.2d at 175–76. But it is not simply a matter of counting days; a wide range of factual circumstances may be relevant to the inquiry:

> The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock: the character of the crime (chance encounter in the night or regenerating conspiracy?), of the criminal (nomadic

> or entrenched?), of the thing to be seized (perishable and easily transferable or of enduring utility to its holder?), of the place to be searched (mere criminal forum of convenience or secure operational base?), etc.

*United States v. Matthews*, 753 F.3d 1321, 1325 (D.C. Cir. 2014) (quoting *United States v. Bruner*, 657 F.2d 1278, 1298 (D.C. Cir. 1981)). In evaluating staleness claims, this court has found it "troubling" that a search warrant issued more than 100 days after investigators last had information of a drug transaction in the location to be searched, but nonetheless held the evidence was admissible under the good-faith exception. *Webb*, 255 F.3d at 904–05. In another case, evidence of drug dealing within four-and-a-half weeks was held sufficiently "fresh" to support probable cause. *United States v. (Curtistine) Johnson*, 437 F.3d 69, 72 (D.C. Cir. 2006).

Under the guidance in *Matthews*, 753 F.3d at 1325, there was probable cause sufficiently fresh to support seizure of the Infiniti. Appellant focuses on the recovered firearm, maintaining that a person who participated in a fatal shooting would be unlikely to retain the murder weapon for long. Yet a murder weapon was not the only type of relevant evidence that might be found. As the recovered Crossfire exemplifies, some types of evidence are not easily removed from a car, like bullet scrapes. Even outwardly innocuous evidence — such as a driver's license or gas receipts — might indicate who operated the Infiniti, and paper records or a cell phone might contain evidence related to the shooting but be less likely to be discarded within a matter of weeks. So understood, the court has no need to address how rapidly probable cause dissipates for inherently incriminating evidence like a murder weapon or illegal drugs. Despite the passage of time, the evidence gathered by the police was sufficient to establish probable

cause to search the Infiniti when it was seized. Appellant's motion to suppress was therefore properly denied. Having so held, the court need not reach the Government's alternative arguments that the Infiniti could have been seized as an instrumentality of a crime or that improperly collected evidence could have nonetheless been admitted under exceptions to the exclusionary rule.

**III.**

Federal Rule of Criminal Procedure 32(i)(3)(B) provides that the sentencing court "must — for any disputed portion of the presentence report or other controverted matter — rule on the dispute *or* determine that a ruling is unnecessary either because the matter will not affect sentencing, *or* because the court will not consider the matter in sentencing." (emphases added). Appellant's sentencing memorandum objected to two criminal history points that the Probation Office included in the presentence report on the theory that his present offense was committed while on probation from a 2006 Maryland case. Appellant countered that he had successfully completed his probation in that matter. The presentence report also suggested a possible upward departure on the basis that the criminal history category was inadequate. *See* U.S. SENT'G GUIDELINES MANUAL §§ 4A1.2 n.6, 4A1.3 (U.S. Sent'g Comm'n 2018). Defense counsel acknowledged that removing the two points would not change appellant's criminal history category or his Sentencing Guidelines range.

At sentencing, defense counsel again objected to the two criminal history points. The district court stated that it would "just not resolve this issue" because it "doesn't affect his criminal history category one way or the other." Sent'g Tr. 7. The district court also noted that the two points would not change the criminal history calculation underlying the

presentence report's suggestion of an upward departure. As the district court stated, "I don't think, under any scenario, it actually matters one way or the other, and so I'm just going to — I'm certainly not going to, you know — it just doesn't matter . . . for these purposes." *Id.* at 8. So "regardless of" the two disputed points, appellant "would be in Criminal History Category V" and would have a Guidelines range of 30 to 37 months. *Id.* Following these observations, the district court asked whether there were any objections to the Guidelines calculation; defense counsel replied, "No, Your Honor." *Id.*

Appellant contends that the sentencing judge cannot "simply decline to rule on an objection that is in fact used in the defendant's sentencing calculation." Appellant's Br. 42. In his view, the two points might have affected the sentence, despite the district court's statements to the contrary. He relies on *United States v. Graham*, 83 F.3d 1466 (D.C. Cir. 1996), for the proposition that "when defendants allege any factual inaccuracy in the presentence report, the court should either make a finding resolving the controverted matter or determine that it will not consider the controverted matter in sentencing the defendant." *Id.* at 1477. Here, the district court did not state that it would "not consider" the two disputed points; it instead observed that appellant would fall in the same criminal history category whether or not the disputed points were included. Appellant contends that this was insufficient to comply with Rule 32(i)(3)(B).

But appellant never raised this objection in district court, and our review is therefore limited to plain error. *United States v. Flores*, 912 F.3d 613, 618 (D.C. Cir. 2019). Although the district court did not expressly omit the disputed points from its calculation of the criminal history score, the record is sufficiently clear that the points did not affect the sentence, and a remand is unnecessary. In addition to stating the two points

would not affect the sentencing of appellant, the district court ultimately varied upwards by ten months from what would have been the top of the Guidelines range even if the two points were included. In particular, the district court reasoned that prior sentences of 22, 36, and 38 months had failed to deter appellant from reoffending and thus that a longer sentence was required. There is consequently no reason to think that resolution of the disputed points in appellant's favor would have resulted in a lower sentence. While it would have been better if the district court had expressly omitted the disputed points from its calculation of the criminal history score, the record is sufficiently clear that the points did not affect the sentence.

Accordingly, we affirm the judgment of conviction.